THE BIG FOUR OIL & GAS COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SOUTHWESTERN OIL AND GAS COMPANY, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57107, 57108. Filed October 14, 1957.

*Robert A. Rundle, Esq.*, and *J. Stanton Carson, Esq.*, for the petitioners.

*George J. Rabil, Esq.*, for the respondent.

34

## OPINION.

KERN, *Judge:* It is necessary to spell out with some particularity the issue in the instant case under the pleadings. The most specific allegation of error contained in the petitions is as follows (paragraph 4 (h)) :

The Commissioner of Internal Revenue erred in determining that petitioner did not qualify for relief under Section 456 of the 1939 Internal Revenue Code with respect to abnormal income for 1950 resulting from exploration, discovery or prospecting, or any combination of the foregoing, extending over a period of more than 12 months.

Paragraphs 5 (b) and 5 (k) of each petition read as follows:

(b) Since March 1st, 1949, petitioner was engaged in exploring in an area in Lawrence County, Illinois designated as Sections 7, 8, 17 and 18 T. 2 N., R. 12 W., Lukin Township for indications favorable to the discovery of oil. During the course of these explorations, employees of the petitioner, acting in its behalf, compiled data, acquired geological information and explored the surface of the area for indications of potential oil and gas productivity.

(k) Operating personnel of the petitioner were engaged in exploratory and discovery work from March 1, 1949 when exploratory work was begun until July 31, 1951 when the completion of the twenty-third well determined the productive limits of the Lukin Township or Ruark Pool.

No date other than March 1, 1949, is alleged in the petitions as the beginning of the "period of more than 12 months" referred to in the allegations of error. Respondent's answers denied all of the allegations of paragraphs 4 and 5 in each petition.

At the trial herein petitioners' counsel inquired of witnesses concerning prospecting and exploration by petitioners in years prior to 1949 and beginning in 1946.[1] Respondent's counsel objected to such evidence on the ground that under the pleadings only testimony concerning exploration and prospecting beginning in 1949 would be relevant to the issues presented. The Court overruled the objections and remarked as follows:

It may be that the only evidence which will be considered pertinent in the disposition of the case is the evidence covering the period alleged in the petition. However, the court is interested in knowing what the facts are; and if the exploration started at a different time, I think the court ought to know when it started.

It was implicit in the Court's ruling (although unfortunately not made explicit) that petitioners' counsel would move to amend the pleadings to conform to the proof during the course of the trial pursuant to Rule 17 (d) of the Tax Court's Rules of Practice, with which, it must be assumed, petitioners' counsel are familiar. However, no such motion was made either during the trial or at any time thereafter, and no amended pleadings were filed by petitioners. See *M. C. Parrish & Co.*, 3 T. C. 119, 129, affd. 147 F. 2d 284; *Louis Halle*, 7 T. C. 245.

Under the pleadings we would be justified in confining ourselves to a consideration of "the evidence covering the period alleged in the petition," and in making no findings with regard to any exploration or prospecting which may have been done by petitioners' agents prior to March 1, 1949. *Samuel J. Rissman*, 6 T. C. 1105.

However, since a careful consideration of the testimony objected to convinces us that petitioners have not thereby borne the burden of proving that there was effective exploration or prospecting by petitioners' agents relating to the property here in question, leading to the discovery of the Ruark Pool, and resulting in the income here claimed to be abnormal, which antedated March 1, 1949, we need not rest our conclusion as to the beginning of the period of exploration,

---

[1] The testimony elicited by these questions was to the effect that one of petitioners' agents did some unorthodox surface prospecting in the area incident to the taking of two leases by one of the petitioners, which leases were surrendered in 1948 before any drillings were made thereon.

discovery, and prospecting solely upon a resolution of the narrow question involving the pleadings herein.

Petitioners' production superintendent testified that in 1946, about the time petitioners acquired two leases in the area adjacent to the later discovered Ruark Pool, he did "surface prospecting in that area covering a considerable amount of territory." One of these leases was identified as the Leighty lease and the other as the Milligan lease. From other evidence in the record it appears that petitioners later acquired leases on two separate properties identified as "Milligan" and on property identified as "Leighty." On one of the Milligan properties no well was ever drilled. On the Leighty lease petitioners drilled one well completed July 31, 1951, and it was a dry hole. The two leases acquired in 1946 were allowed to expire at some undisclosed date in 1948. The type of exploration and prospecting done by the production superintendent, who was not a geologist, was to examine the surface of the area for "hydrocarbon balls," for unhealthy-looking timber and crops, and for "toadstools or growths on it which is supposed to be the result of escaping gases which does form hydrocarbon." If the "hydrocarbon balls," small globules about as big as a peppercorn, looked black the witness considered them as having a high hydrocarbon content and indicating the presence of oil in the locality. He made no chemical analysis of them, made no borings below the surface, no soil analyses, and caused no geophysical surveys or maps to be made. From the testimony of other witnesses, we are of the opinion that the type of exploration and prospecting done by this witness was not effective.

Furthermore, although this witness testified in a general way that he did this exploration and prospecting up to 1949, he stated that he "continued in the area covering different tracts of land. * * * This work was continued at different intervals from 1946 until we actually acquired the leases in 1949." The record does not show the specific work he did in connection with the leaseholds here in question, nor the amount of time spent by him in that specific work.

Finally the petitioners have not proved that any work done by this witness resulted in the discovery of the Ruark Pool and the realization of the income here in question. While petitioners' president testified that he accepted the recommendation of the production superintendent with regard to taking the two leases in 1946, he did not testify that the 1949 leases were taken or the wells were driven in reliance on any advice given by him or as a result of any prospecting or exploration made by him. When asked on cross-examination whether he accepted the hydrocarbon-deposit theory of the production superintendent, he gave the rather noncommittal answer: "I accepted his theory on everything to our benefit." It is significant that when the time came to drill

the test well on the 1949 leases, its location was fixed according to the recommendation of a subsurface geologist employed by the Hayes Drilling Company.

Upon the entire record we conclude that no effective exploration or prospecting leading to the discovery of the property here involved, or resulting in the income here claimed to be abnormal, was done by petitioners for any ascertainable period of time prior to March 1, 1949.

Accordingly, the issue presented herein is whether the income here in question resulted from "exploration, discovery, or prospecting" extending over a period which began on March 1, 1949, and was terminated, as respondent contends, on or about October 14, 1949, when a producing oil well was completed on petitioners' leased premises and the existence of an oil pool was thereby established, or was terminated on July 31, 1951, when, as petitioners contend, "the completion of the twenty-third well determined the productive limits of the Lukin Township or Ruark Pool."

It should be pointed out in this connection that petitioners' claim to abnormal income, as defined in section 456 (a) (2) (B) of the Internal Revenue Code of 1939,[2] relates to the entire amount of income derived by them in 1950 from the so-called Ruark Pool, and not to the specific income from the individual wells drilled therein.[3] Thus we are not called on to decide and do not decide whether the time required for drilling oil wells in a known pool constitutes a period of "exploration, discovery, or prospecting" relating to a subsequently drilled oil well in that pool. For example, we do not decide whether the income from well No. 19, which was completed as a producing well on June 11, 1950, was abnormal in that it resulted from "exploration, discovery, or prospecting" extending over a period which included the drilling of prior wells in the pool plus a period of exploration and prospecting beginning March 1, 1949.

As we have indicated, this case involves an interpretation of section 456 (a) (2) (B). This subsection was written into the Internal Revenue Code of 1939 by section 101 of the Excess Profits Tax Act of 1950. As stated by the Ways and Means Committee (H. Rept. No. 3142, 81st Cong., 2d Sess.), this section (456) in general "corresponds to section 721 as amended, in the World War II excess profits

---

[2] SEC. 456. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

   (a) DEFINITIONS.—For the purposes of this section—
   *          *          *          *          *          *          *
   (2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:
   *          *          *          *          *          *          *
   (B) Income resulting from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months; * * *

[3] Petitioners' excess profits tax returns break down the total receipts from the Ruark Pool to receipts from "Productive Leases." It is impossible to determine from these returns, or otherwise, the receipts from the individual wells.

tax law." However, the report goes on to say that: "Subparagraph (C) of subsection (a) (2) of the prior law has been redefined and restricted as appears in subparagraphs (B) and (C) of subsection (a) (2) of" section 456. We set out in the margin section 721 (a) (2) (C) referred to above.[4] Its redefinition and restriction consists of the omission of the words "research, or development of tangible property, patents, formulae, or processes."

The petitioners' position, on the issue stated by us above, is that the period of "exploration, discovery, or prospecting" relating to a petroleum pool is not completed until its bounds and limits are definitely ascertained; that all of their drilling activities in connection with the Ruark Pool constituted a process of "exploration, discovery, or prospecting, or any combination of the foregoing," which continued until the drilling of the last well on July 31, 1951; that this lasted for a period of more than 12 months; and "that, therefore, they are entitled to the relief provided by Section 456 of the Internal Revenue Code of 1939 for abnormal income derived from such activities."

Respondent's position on brief is in effect a reiteration of the views expressed in Revenue Ruling 236, 1953–2 C. B. 236. Because there are no decided cases and no promulgated regulations of the Commissioner helpful in a solution of the question before us, and because this Revenue Ruling not only states the position of respondent but also outlines the complicated statutory background of the problem, we set forth the greater part of that ruling, as follows:

2. *Exploration, discovery, or prospecting.*—Exploration or prospecting by a taxpayer begins with the first field work designed to determine whether to acquire or retain the acreage in the area in which a discovery is later made. (See I. T. 4006, C. B. 1950–1, 38.) It does not include the general research of published reports to determine where exploration might be profitable. Exploration is ended and discovery occurs for a pool when a well is completed that proves the presence of oil or gas in commercial quantities. Subsequent drilling in the pool, while it may contain a large element of risk, constitutes exploitation to reap the benefits of the discovery. To the extent that "development" is the equivalent of "exploration" or "discovery," it may result in abnormal income under section 456; to the extent that "development" is the equivalent of "exploitation," it will not result in any abnormal income within the meaning of section 456.

3. *Period of exploration, discovery, or prospecting.*—To qualify under section 456 (a) (2) (B) income must result from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than

---

[4] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

    \*        \*        \*        \*        \*        \*

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

    \*        \*        \*        \*        \*        \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; \* \* \*

12 months. This means that the elapsed time between the commencement of exploration or prospecting and the resulting discovery, as defined in paragraph 2, exclusive of any intervening periods of inactivity, must total more than 12 months. Only the actual time consumed from the initial steps in the exploration or prospecting to the final completion of the discovery well that proved the presence of oil or gas in commercial quantities is to be considered in measuring the time elapsed.

4. *Class of income.*—The entire income of a taxpayer which results from exploration, discovery, or prospecting, or any combination of the foregoing, extending over a period of more than 12 months, constitutes a single class of income.

5. *Determination of abnormal income.*—That part of the gross income from the sale of oil and/or gas from properties of the taxpayer which meets the other requirements of section 456 and which is attributable to the exploration, discovery, or prospecting of such properties constitutes abnormal income within the meaning of section 456 (a) (2) (B). That part of the gross income from the sale of oil and/or gas from the taxpayer's properties which is attributable to the exploitation of such properties, however, does not under any circumstances constitute abnormal income within the meaning of section 456 (a) (2) (B). Any method of allocation will be acceptable which reasonably determines the portions of income which are attributable to exploration, discovery, or prospecting of the properties and the portions of income which are attributable to the development or exploitation of the properties in view of the respective risks undertaken. * * *

     *      *      *      *      *      *      *

6. *Items of abnormal income.*—An item of abnormal income consists of the abnormal income, as defined above, attributable to a single discovery. Thus, the amount of an item of abnormal income in any taxable year is equal to that portion of the income, attributable to the discovery, realized in such taxable year from a particular oil and/or gas pool which is proved by a single discovery well. For the purposes of this Revenue Ruling, a "pool" means any underground accumulation of crude petroleum or associated hydrocarbon substances including, but not limited to, natural gas, constituting a single and separate reservoir or source of supply within a field. The probable limits of such new pool, as determined by the best evidence available at the date of completion of the discovery well, thus define the area within which all leases or properties owned at the time by the discoverer would be included in the discovery. Later discoveries of new pools in the same area may be made in different sands or horizons, and again the income attributable to the discovery of the new pool would be determined by the facts known as of the date of discovery. No adjustments will be made because of any subsequent information.

The abnormal income of a taxpayer for any year, either the current taxable year or one of the 4 prior taxable years, consists of the sum of the items of abnormal income, as defined above, from all discovery units of the taxpayer yielding such income in the given year.

The income here in question must be considered as derived from the Ruark Pool (an assumption made by both parties in their approach to the problem). As we have pointed out, there is no contention based upon the segregation of the income as from individual wells drilled by petitioners.

Considering the income as derived from the pool, we are of the opinion that the exploration, discovery, and/or prospecting, which

*resulted* in that income, necessarily must antedate and end with the discovery of the pool and the practical availability to petitioners of income therefrom, which would in this case be on or about October 14, 1949, and certainly not later than November 5, 1949, when the completion of the fifth producing well proved without doubt the existence of an oil pool covered by petitioners' leases. Petitioners' hope and purpose in drilling additional wells on their leases may well have been twofold, first and primarily to obtain more oil from the pool and thereby exploit and develop it, and, second, to ascertain the extent, size, and shape of the pool. Insofar as these drillings were intended to result and did result in the receipt of income by petitioners, they constituted an exploitation and a development of an oil pool discovered on or about October 14, 1949, as a result of exploration and prospecting carried on prior thereto. Webster's New Collegiate Dictionary defines "exploration" as "[a]ct of exploring, as for geographical discovery," and in discussing the word "discover" the same work says: "Discover presupposes exploration * * *." It also defines "discovery" as "1. Act of discovering," and the verb "prospect" as "[t]o explore or examine for something." We consider that Congress in using the words "exploration, discovery, or prospecting" meant acts leading up to and antedating the finding of the thing discovered, which in this case, according to the hypothesis made by both parties, was the oil pool here in question. A factor leading us to this conclusion is the deliberate omission by Congress in enacting section 456 (a) (2) (B) of the word "development," which had appeared in the predecessor statute. We consider that Congress did not mean the words "exploration, discovery, or prospecting" to include acts seeking information about the thing already discovered, performed as incidents to its development and exploitation after it was discovered. This conclusion accords with the distinction made by the oil industry itself between discovery wells and development wells. Thus, in Williams & Meyers, Manual of Oil and Gas Terms (1957), p. 91, an exploratory or discovery well is defined as a well drilled "for the purpose of ascertaining the presence underground of a commercial petroleum deposit. * * *" In contrast, this Manual defines a development well as a "well drilled with the expectation of producing from a known productive formation, and which is located in accordance with spacing regulations and field development requirements [p. 91]." The Manual also defines development as the "drilling and bringing into production of wells in addition to the exploratory or discovery well on a lease * * * [p. 61]."

We are not unmindful of the testimony of petitioners' witnesses to the effect that the drilling of wells after the discovery well constituted exploration in that they served to ascertain the limits of the Ruark

Pool. For the reasons stated, we do not consider that the drilling of the development wells, after the drilling of the discovery well or wells, was the "exploration" contemplated by Congress in the phrase under examination. However, even if we are mistaken in this conclusion, it seems obvious to us that the income from the Ruark Pool, claimed here to be abnormal, cannot be considered as having *resulted* from any exploration, as such, made after the discovery of the Ruark Pool and the start of its development.

Therefore, we conclude that the income here in question, claimed by petitioners to be abnormal income from the Ruark Pool, resulted from "exploration, discovery, or prospecting," which extended over a period which could not have been longer than from March 1, 1949, to November 5, 1949, and since this period was not "of more than 12 months" petitioners are not entitled with regard to this income to the relief accorded by section 456 of the Internal Revenue Code of 1939.

Reviewed by the Court.

*Decisions will be entered for respondent.*